IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ANTON JOHNSON, SR.,<br><br>  Petitioner,<br><br>vs.<br><br>DANIEL PARAMO, Warden, Richard J.<br>Donovan Correctional Facility,[1]<br><br>  Respondent. | No. 2:12-cv-00459-JKS<br><br>MEMORANDUM DECISION |

Anton Johnson, Sr., a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Johnson is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at the Richard J. Donovan Correctional Facility. Respondent has answered, and Johnson has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

On November 16, 2007, Johnson was charged with committing several sexual offenses under the One Strike Law[2] on two separate occasions in 1999 and 2000 against two separate victims. As to victim Terri Doe, the information charged Johnson with aggravated kidnapping to commit rape (count 1), forcible oral copulation (count 2), forcible rape (count 3), sexual battery (count 4), and second-degree robbery (count 5). The offenses against Terri were alleged to have

---

[1]   Daniel Paramo, Warden, Richard J. Donovan Correctional Facility, is substituted for Matthew Cate, former Secretary of the California Department of Corrections and Rehabilitation. FED. R. CIV. P. 25(c); Rule 2(a), Rules Governing Section 2254 Cases in the United States District Courts; *Stanley v. Cal. Supreme Court*, 21 F.3d 359, 360 (9th Cir. 1994).

[2]   *See* CAL. PENAL CODE § 667.61. "Section 667.61 sets forth an alternative and harsher sentencing scheme for certain enumerated sex crimes." *People v. Mancebo*, 41 P.3d 556, 557 (Cal. 2002).

occurred on April 29, 2000.  As to victim Virginia Doe, the information charged Johnson with

aggravated kidnapping to commit forcible oral copulation (count 6), sexual battery (count 7),

three counts of forcible oral copulation (counts 8 through 10), and two counts of forcible sexual

penetration (counts 11 and 12).  The offenses against Virginia were alleged to have occurred on

March 5, 1999.  The pleading also alleged as to counts 2 and 3 involving Terri and counts 8

through 12 involving Virginia that Johnson kidnapped the victim and that such kidnapping

substantially increased the risk of harm to the victim.  The pleading further alleged that Johnson

committed sex offenses against multiple victims.  Johnson pled not guilty to all charges and

denied all allegations.

Johnson first proceeded to a jury trial in October 2007.  On December 3, 2007, after

several days of deliberations, the court declared a mistrial based on the jury's inability to reach a

unanimous verdict on any count.

In April 2008, Johnson was retried before a different judge and jury.  On direct appeal of

his conviction, the California Court of Appeal recounted the following facts regarding the

evidence presented at Johnson's retrial:

> In March 1999, Virginia Doe was having "issues" with her young child's father,
> John Robinson, about his relationship with another woman, Claudette Romo.  A
> restraining order prohibited Virginia from having any contact with Romo.
> In the early morning of March 5, 1999, Virginia was distraught because she
> believed her child and Robinson were spending the night with Romo and the restraining
> order prohibited Virginia from going to Romo's to retrieve her child.  Around 4:26 a.m.,
> she drove to the parking lot of a convenience store located at the same intersection as the
> apartment complex where she suspected Romo lived.  The store was closed, and Virginia
> used a pay phone outside to call 9-1-1 in the hope that law enforcement officers would
> help her retrieve her child.  The dispatcher informed Virginia that her situation was not
> an emergency and directed her to call the non-emergency number.  When she did, the
> second dispatcher was not helpful either.
> Virginia testified that a black Ford Thunderbird carrying [Johnson] and two other
> men drove into the parking lot before she made the second phone call.  [Johnson] got out,

"asked [her] if [she] was somebody," and when she told him "no," he got back in the car and drove away.  The car came back while she was making the second call.  [Johnson] got out, and the car drove away.

[Johnson] stood by the other pay phone while Virginia spoke to the second dispatcher.  After the call ended, [Johnson] offered her money to make another call.  She declined.  When Virginia started to leave, [Johnson] hit her head with the handset from the pay phone.  She fell to the ground, "lost focus for a few minutes," and [Johnson] dragged her to the side of the store.  He beat and choked her with both hands, then pulled her by her hair to a dark alley behind the store.  [Johnson] forced Virginia to get on her knees and then made her orally copulate and masturbate him.  At one point, he forced her to rise, and he put his mouth on her breasts and inserted his fingers in her vagina.  He threatened to rape her, stating "it would be so easy for him to kill [her] and throw [her] behind the garbage can . . . ."  [Johnson] eventually ejaculated in her mouth.

After the assault, [Johnson] seemed like a "changed person," apologizing and telling her he would help get her daughter back.  He told her to walk to the front of the store with him, but not too far because there were security cameras.  As they crossed the street towards the apartment complex, Virginia turned, ran back to her car, and drove away at 5:11 a.m.  She drove to a gas station and asked the attendant to call 9-1-1.  The police received the call at 5:19 a.m.  Law enforcement officers were dispatched to the gas station and contacted Virginia, who was hysterical, had a cut near her left eyebrow, and had bloodstains on her shirt.

Then-Detective Robert James went to the convenience store and retrieved a videotape from the surveillance camera.  The camera was mounted on the rear interior store wall and had only a limited view of the parking lot through the front windows.  Someone lost the videotape between the initial investigation in 1999 and [Johnson's] first trial in 2007, but James had written a report about its contents.  He testified that Virginia's vehicle entered the parking lot at 4:26 a.m. and stopped in front of the pay phones.  However, the pay phones and Virginia were not visible on the tape because the camera captured only the rear of the car after she parked.  A few minutes later, a second vehicle, which appeared to be a black Thunderbird, entered the parking lot and stayed only a brief period of time.  Virginia's vehicle left the parking lot at 5:11 a.m.

Virginia was taken to the hospital at 6:10 a.m. where she was examined by nurse Nancy Siegel, who collected DNA swabs from inside Virginia's mouth and vagina, and from both breasts.  Virginia had a small laceration below her left eyebrow that required sutures.  She had purple swelling with tenderness under her left eye, a small purple mark inside her right cheek, and an area of redness and swelling outside of her vagina.  She also had an abrasion on her right knee and one on her right elbow, as well as red or purple marks on the back of her legs.  Her injuries were consistent with the sexual assault she described.

In 2006, forensic testing revealed [Johnson] was the source of the DNA collected from Virginia's right breast.

[Johnson] sexually assaulted another woman in April of 2000, while he was dating a young woman named Roni Huckabay.  At least twice a year, he expressed an interest in having Huckabay engage in sexual activity with him and another woman.  He

3

frequently attacked Huckabay physically, hitting her head, choking her, punching her, knocking her out, and inflicting sores on her arms, back, and head. [Johnson] also assaulted Huckabay verbally, by threatening to hurt or kill her father, and telling her he wanted to rape her mother.

On April 29, 2000, while driving Huckabay home at 2:30 a.m., [Johnson] told her "he wanted to pick up a prostitute." Huckabay asked that [Johnson] just take her home, and he became angry and pushed or hit her. He drove around while "scanning the roads, looking around very serious."

At the same time, Terri Doe was walking to work on Fulton Avenue in Sacramento. [Johnson] drove past her, turned into a side street, and parked the car. He grabbed Huckabay's arm and held on to her, making her run with him across the street towards Terri. [Johnson] released Huckabay's arm and grabbed Terri from behind, wrapping both of his arms around her and moving her to an alley between two buildings. [Johnson] leaned Terri against the wall and struck her in the mouth with the back of his hand. He told her he was doing this for some guy that she had ripped off, but she had no idea what he was talking about. Huckabay told her they would cut her throat if she did not cooperate.

While Terri was sitting on the ground, [Johnson] attempted unsuccessfully to insert his penis in her mouth. [Johnson] got on top of her and raped her, while telling Huckabay to kiss her. Huckabay complied and placed her mouth on Terri's mouth and breasts. [Johnson] also licked Terri's breasts. He stopped assaulting her after he ejaculated. [Johnson] stole Terri's identification cards and threatened to kill her if she reported the assault.

After the attack, Terri ran to her worksite. When Deputy Michael Baerresen responded to the report of a sexual assault, he found Terri "very upset and crying." Throughout the interview, she "would burst into periods of anger and swearing at what had happened, then she'd start to cry again."

Nurse Siegel examined Terri at 6:45 a.m. and collected swabs from inside of Terri's mouth and vagina, and from both breasts. Terri had an abrasion on her left knee and right arm, and red marks on her right arm, her back, and inside of her lower lip. Siegel opined that the injuries were consistent with the sexual assault Terri described.

In 2006, forensic testing confirmed that [Johnson] was the source of the DNA collected from Terri's breasts and vagina, and also confirmed that Huckabay's DNA was on Terri's left breast. The prosecution initially charged Huckabay as an accomplice to the crimes involving Terri, but later dismissed the charges when she agreed to testify at [Johnson's] trial.

[Johnson's] former wife, Julie Johnson, testified [Johnson] asked her on several occasions to have sex with him and another woman, who was a relative stranger. She refused. She also related that one day in 1991, their car caught fire at a stoplight while [Johnson], Julie, and their daughter, April, were in the car. [Johnson] stayed with the car, and Julie took April and walked to her parents' home where they were all living. When [Johnson] eventually arrived home, Julie was in the bathroom. [Johnson] was angry and came into the bathroom holding a handgun. He told Julie that if she "caused a scene or call[ed] the cops, that he could blow [her] away." He "directed the gun towards [her]

4

head and asked for some oral sex." She was scared but refused, whereupon he told her there was a bullet in the chamber. He also said that he could kill her family. When Julie saw her parents pulling into the driveway, she managed to escape and run outside to them, and then she called the police.

*Defense*

Romo testified that Virginia once told her that she had considered making a report of domestic violence against Robinson, based on bruises she incurred from when they were "messing around."

Robinson, who had three children with Virginia, ranging in age from three and a half years to seventeen years, testified they had an on-and-off relationship. He stated that she keyed his car after seeing him at a nightclub, and called him 20 to 30 times a day at work, threatening to cause problems for him with his employer. He also said that Virginia made a false report of domestic violence against him and that, on several occasions, she threatened to make additional false reports.

Robinson acknowledged that he was dating Romo during some of the problems he experienced with Virginia and that, from Virginia's perspective, he was cheating on her. He admitted he had a felony grand theft conviction and was convicted of domestic violence against a woman in February 1994. He claimed he was not sure who the victim was, but conceded he was in an intimate relationship with Virginia at that time.

Leonora Hoyt testified that on the morning that Virginia was assaulted, Hoyt and her husband drove through the alley behind the convenience store before her husband dropped her off for work at a nearby daycare center, between 5:00 and 5:30 a.m. They did not see or hear anything unusual. However, the alley was dark, the car's headlights provided the only illumination, the car's windows were rolled up, and it was her custom to talk with her husband during the commute.

Terri Sadler, the area manager of the business where Terri Doe worked, supervised about 60 employees, including Terri. Sadler had only a vague recollection of the day that Terri was assaulted, but believed Terri appeared disheveled when she arrived at the office that morning. Sadler did not recall whether she personally spoke with Terri, but she believed that Terri wanted to go home rather than report the assault and had to be persuaded to make a report. Sadler fired Terri for excessive absenteeism about six months later in October 2000.

At the time she was sexually assaulted by [Johnson], Terri had methamphetamine in her blood.

Defense counsel sought to cast doubt on the credibility of Virginia, Terri, and Julie, each of whom had felony convictions or misdemeanor convictions involving moral turpitude. Counsel conceded [Johnson] had sexual contact with Terri and Virginia, but argued it was consensual.

*People v. Johnson*, No. C059147, 2010 WL 1692165, at *1-5 (Cal. Ct. App. Apr. 28, 2010).

On May 6, 2008, the second jury found Johnson guilty of counts 1, 3 through 5, and 7 through 12. It also found true all of the special allegations tied to those counts. While it found Johnson not guilty of counts 2 and 6, it convicted him of the lesser-included offenses of those counts, attempted forcible oral copulation and simple kidnapping, respectively.

The trial court subsequently sentenced Johnson to an aggregate imprisonment term of 81 years and 6 months to life, calculated as follows: two consecutive One Strike terms of 25 years to life on counts 3 and 8; two consecutive terms of 8 years on counts 9 and 10; two consecutive terms of 6 years on counts 11 and 12; a consecutive term of 1 year and 6 months on count 2; and 2 consecutive terms of 1 year on counts 5 and 7. Pursuant to Penal Code § 669, the court imposed a concurrent sentence for count 4, and it stayed the sentence for counts 1 and 6 under Penal Code § 654.

Through counsel, Johnson appealed his conviction, arguing that: 1) the trial court erred in admitting as propensity evidence an uncharged act of sexual violence against his ex-wife; 2) the trial court likewise erred in admitting evidence of domestic violence as probative of Huckabay's credibility; 3) the court denied him of his rights to a fair trial, to present a defense, and to confront his victims when it excluded certain impeachment evidence; 4) the trial court erred in denying his motion to strike police opinion testimony relating to Terri's credibility; 5) the trial court should have dismissed the charges or imposed sanctions due to the loss of certain evidence; 6) the prosecutor committed prejudicial misconduct during summation; 7) the trial court erroneously instructed the jury regarding the prior act of sexual violence on his ex-wife; 8) the trial court erroneously instructed the jury on the limited purposes for which it could consider evidence regarding group sex; 9) the trial court erroneously instructed the jury on the

6

circumstances it could consider in determining whether Johnson committed a simple kidnapping of Virginia; 10) California law defining the asportation elements of simple and aggravated kidnapping are unconstitutionally vague; 11) the trial court erred in failing to hold a *Marsden*[3] hearing on his request to substitute counsel; 12) the cumulative effect of the asserted errors deprived Johnson of due process and warranted reversal of the judgment; 13) the robbery conviction under count 5 was barred by the statute of limitations; 14) the sentence for attempted forcible oral copulation in count 2 was unauthorized; and 15) the sentencing court orally imposed an unauthorized term of life without parole on count 1.

The State conceded that, with regard to claim 9, the trial court erroneously instructed the jury on the circumstances it could consider in determining whether Johnson committed a simple kidnapping of Virginia under Penal Code § 207.  As to claim 13, the State also agreed that the robbery conviction must be reversed but argued that the matter should be remanded for the trial court to give the prosecutor the option of presenting evidence that an arrest warrant issued against Johnson was within the statute of limitations.  The State also acknowledged that Johnson's sentencing challenges in claims 14 and 15 had merit such that the sentencing abstract should be corrected.  The State opposed the appeal in all other respects.

On April 28, 2010, the Court of Appeal issued an unpublished, reasoned opinion reversing the robbery conviction (count 5) and the simple kidnapping count involving Virginia (count 6), as well as the kidnapping enhancements on counts 8 through 12.  *Johnson*, 2010 WL 1692165, at *30.  It also directed the trial court to modify the abstract of judgment to correct the

---

[3]     *People v. Marsden*, 465 P.2d 44 (Cal. 1970) (holding it was error for the trial court to deny a defendant's motion to relieve his court-appointed attorney without holding a hearing to allow the defendant to explain its grounds).

sentencing errors.  The appellate court affirmed the judgment in all other respects.  Counsel for

Johnson then petitioned for review to the California Supreme Court, raising all claims

unsuccessfully raised before the Court of Appeal.  The supreme court summarily denied review

on August 11, 2010.

Johnson, proceeding *pro se*, filed in the California Supreme Court a petition for a writ of

habeas corpus dated June 16, 2011.  In that petition, Johnson alleged that his trial counsel was

ineffective for failing to: a) investigate the elements and statute of limitations of the charges

against him; b) offer "stronger grounds" in support of his objections to the court's preclusion of

proffered impeachment evidence; and c) call an "independ[e]nt expert to evaluate the physical

evidence."  Johnson additionally re-asserted his claim that the trial court erred in precluding him

from introducing certain impeachment evidence and also raised a new claim that the trial court

improperly prevented Johnson from communicating with his counsel at trial.  The Supreme

Court denied the petition without comment on November 16, 2011.

On February 10, 2012, Johnson timely filed a *pro se* Petition for a Writ of Habeas Corpus

to this Court.

## II. GROUNDS/CLAIMS

In his *pro se* Petition, Johnson raises four general grounds for relief that involve

numerous subclaims.  First, he argues that the trial court committed a myriad of reversible errors.

He next argues that the prosecutor committed prejudicial misconduct in a number of ways.

Third, he alleges that his trial counsel was ineffective for a variety of reasons.  Finally, Johnson

alleges that the existence of cumulative error warrants reversal of his conviction.

### III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding,"

§ 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that

contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that

are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives

at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1)

"refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the

relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon

the states; that is, the decision must be based upon constitutional grounds, not on the supervisory

power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where

holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it

cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"

*Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are

beyond the purview of this Court in a federal habeas proceeding.  *See Swarthout v. Cooke*, 131 S.

Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was

correctly applied).  It is a fundamental precept of dual federalism that the states possess primary

authority for defining and enforcing the criminal law.  *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court.  *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

IV. DISCUSSION

<u>Ground 1. Court Errors</u>

In his first ground for relief, Johnson argues that the trial court committed a myriad of errors which warrant reversal of his conviction.

    A.    *Violations of Rights to Confrontation and to Present a Defense (First, Second, and Fourth Errors)*

In support of his first ground, Johnson contends that his rights to present a defense and confront the witnesses against him were violated by three of the trial court's evidentiary rulings. The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."  U.S. CONST. amend. VI.  It is well settled that, under the Sixth Amendment, an accused has the right to present witnesses, testimony and other evidence in his defense.  *See Washington v. Texas*, 388

10

U.S. 14, 19 (1967).  However, "[t]he accused does not have an unfettered right to offer testimony

that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."

*Taylor v. Illinois*, 484 U.S. 400, 409-10 (1988).  States have considerable latitude under the

Constitution to establish rules excluding evidence from criminal trials.  *Holmes v. S. Carolina*,

547 U.S. 319, 324 (2006).   "Thus, a trial judge may exclude or limit evidence to prevent

excessive consumption of time, undue prejudice, confusion of the issues, or misleading the jury.

The trial judge enjoys broad latitude in this regard, so long as the rulings are not arbitrary or

disproportionate."  *Menendez v. Terhune*, 422 F.3d 1012, 1033 (9th Cir. 2005) (citations

omitted); *see Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996) (holding due process rights are not

violated by exclusion of relevant evidence where probative value is outweighed by danger of

prejudice or confusion).

Federal Rule of Evidence 403, the federal counterpart to California Evidence Code

section 352, permits the exclusion of evidence if its probative value is "substantially outweighed

by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay,

wasting time, or needlessly presenting cumulative evidence."  "A district court is accorded a

wide discretion in determining the admissibility of evidence under the Federal Rules.  Assessing

the probative value of [the proffered evidence], and weighing any factors counseling against

admissibility is a matter first for the district court's sound judgment under Rules 401 and

403 . . . ."  *United States v. Abel,* 469 U.S. 45, 54 (1984); *see Boyd v. City and Cnty. of San

Francisco*, 576 F.3d 938, 948 (9th Cir. 2009).  California employs a similar rule.  *See People v.

Harris*, 118 P.3d 545, 565 (Cal. 2005) ("We review for abuse of discretion a trial court's rulings

on the admissibility of evidence.").

In *Wood v. Alaska*, 957 F.2d 1544, 1549-50 (9th Cir. 1992), the Ninth Circuit laid out a two-part inquiry to determine whether a petitioner's Sixth Amendment rights are violated by restricted cross-examination.  The first inquiry is whether the evidence is relevant.  *See id*. at 1550.  If the evidence is relevant, the next inquiry is whether other legitimate interests outweigh the defendant's interest in presenting the evidence.  *See id.*

> i.    Virginia's Recent Offense (First Error)

Johnson first argues that the trial court denied him of a fair trial by improperly restricting his right to present evidence that one of the victims, Virginia, had committed an assault and had been released on bail hours before she encountered Johnson.  On direct appeal of his conviction, the Court of Appeal considered and rejected this claim as follows:

> [Johnson] also sought to introduce evidence that, on the date of the attack on Virginia, she had just been released on bail after attacking Romo in violation of the restraining order that required her to stay away from Romo.  Despite being warned to stay away from Romo, she immediately went to a pay phone across the street from Romo's apartment and attempted to get police assistance in retrieving her child. [Johnson] believed that it was necessary to provide this background to demonstrate Virginia had a desperate motive to enlist [Johnson's] help in getting her child back. Thus, she might have been willing to engage in consensual sex in return for his assistance.
>
> The trial court ruled [Johnson] could introduce evidence that Virginia was convicted of assault, a crime of moral turpitude, but he could not elicit whom she assaulted or why.  The court also excluded evidence that Virginia had just been released from jail and that she called Romo before calling the police.  The court permitted, however, the introduction of evidence that Romo had a restraining order against Virginia and because of this she sought police assistance in getting her child.  The court found the tangential relevance of details of Virginia's obsessive concerns about Romo, Robinson, and her child was "fraught with 352" because it was confusing and would involve an undue consumption of time on a collateral matter.
>
> Evidence was introduced that Virginia had a misdemeanor conviction for assault and felony and misdemeanor convictions for welfare fraud.  As for the events on the date of the sexual assault, Virginia explained that she was distraught because she believed her child and Robinson were spending the night at Romo's.  Because of the restraining order, she could not go to Romo's to retrieve her child so she went to the pay phone across the street from where she believed Romo lived and called the police for assistance.

[Johnson] also introduced evidence that, before calling the police, Virginia tried to call Romo.

[Johnson] complains this was insufficient to impeach Virginia's credibility and he should have been permitted to show that (1) Romo was the victim of Virginia's assault, (2) Virginia persistently stalked Romo, (3) she had just been released from jail when she drove across town to get her child, (4) she called Romo before the police in violation of the restraining order, and (5) she was especially upset that night because she learned Romo was taking care of her child.  [Johnson] contends all of these facts were necessary to demonstrate Virginia was desperate enough to have casual sex with a stranger if he would help her get her child back.

The record discloses that evidence was introduced as to the last two items on [Johnson's] list.  In any event, his argument is unconvincing.

A court has broad discretion under section 352 to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  This discretion allows the trial court broad power to control the presentation of proposed impeachment evidence "'"to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." [Citation.]'"  (*People v. Lewis* (2001) 26 Cal.4th 334, 374-375.)  On appeal, we evaluate the court's ruling by applying an abuse of discretion standard.  (*People v. Hovarter*, *supra*, 44 Cal.4th at p. 1005.)

[Johnson] fails to show the court's decision was arbitrary or capricious.  The fact that Virginia was at a pay phone across the street from Romo's apartment at 4:26 a.m. and called 9-1-1 for help in getting her child back demonstrated that Virginia was desperate to retrieve her child.  Her criminal record reflected poorly on her honesty.  Therefore, the court permitted ample evidence from which [Johnson] could attack Virginia's credibility and demonstrate that she had a motive to engage in casual sex in exchange for assistance in getting her child.  The court did not abuse its discretion in excluding evidence concerning the relationship between Romo and Virginia on the ground that it would be confusing and would entail an undue consumption of time.

*Johnson*, 2010 WL 1692165, at *11-12.

Under the guidelines laid out above, this Court cannot find that the trial court's restriction on the proposed cross-examination was either unreasonable or contrary to federal law for the reasons enumerated by the Court of Appeals in its comprehensive and thoughtful analysis.  As the Ninth Circuit has explained, there is no Sixth Amendment violation "so long as the jury has 'sufficient information' upon which to assess the credibility of a witness."  *Wood*, 957 F.2d at 1549-50 (citation omitted).  The appellate court's holding that there was "ample evidence" from

which Johnson could challenge Virginia's credibility and argue that she had a motive to consent to sex with Johnson is both reasonable and fully supported by the record.

The Supreme Court's decision in *Olden v. Kentucky*, 488 U.S. 227 (1988), does not compel a contrary conclusion. *Olden* involved the prosecution of a black defendant for rape, kidnaping, and sodomy. 488 U.S. at 228. The defendant had asserted a defense of consent and maintained throughout trial that the alleged victim concocted the rape story to protect her relationship with her then live-in boyfriend. *Id.* The defendant argued it was crucial he be allowed to introduce evidence of the victim and her boyfriend's cohabitation at the time of trial to show the alleged victim's motive to lie. *Id.* at 229-30. However, the trial court excluded all evidence of the victim's living arrangement, even when she testified on direct examination that she was living with her mother. *Id.* at 230. In reversing, the Supreme Court found that the trial court's refusal to permit the defendant from cross-examining the complainant regarding her cohabitation violated the defendant's Sixth Amendment right to confront the witness, as such evidence was relevant to defendant's claim that he and complainant engaged in consensual sexual acts. The *Olden* Court identified complainant's motive to lie and found the excluded evidence had impeachment value to support her motive to lie. *Id.* at 232.

This case is easily distinguishable from *Olden*. In *Olden*, the Supreme Court held that denying the defendant the opportunity to cross-examine the complainant about her cohabitation with her then live-in boyfriend when she testified that she lived with her mother amounted to a Confrontation Clause violation as a "reasonable jury might have received a significantly different impression of [the witness's] credibility had [defense counsel] been permitted to pursue his proposed line of cross examination." *Olden*, 488 U.S. 232. But, again, in this case the trial

14

court allowed "ample evidence" from which Johnson could challenge Virginia's credibility and argue that she had a motive to consent to sex with Johnson.  Thus, Johnson cannot show that the excluded evidence would have caused the jury to reach a different conclusion regarding either Virginia's general credibility or her desperation on the morning of the sexual assault.  Moreover, there is nothing in the record to suggest that Virginia subsequently used the sexual assault to her advantage when trying to regain custody of her child.  Thus, unlike in *Olden*, Johnson proffers no motive for Virginia to lie about the encounter being by force rather than by consent.  Accordingly, Johnson cannot show that the trial court's restriction contravened or unreasonably applied federal law, and he is not entitled to relief on this claim.

        ii.        Huckabay's Prior Statement (Second Error)

Johnson next contends that the trial court erred when it restricted his right to cross-examine prosecution witness Roni Huckabay by excluding her prior statement to law enforcement in which she allegedly denied "ever seeing the Petitioner force any one [sic] into having a 3 way."  Johnson raised this claim in his habeas petition to the California Supreme Court, which was summarily denied.

During the cross-examination of Huckabay, defense counsel sought to introduce portions of her interview by Detective Hendricks during the investigation of Terri's assault.  During that interview, Huckabay and Detective Hendricks had the following conversation:

| | |
|---|---|
| HENDRICKS: | So was there any time any women ever . . . started to back out of the whole thing and he probably pressured and wanted to—got left [sic] with them or anything like that? |
| R. HUCKABAY: | Um, not that—I mean he's—like was, uh, rough sexually, period.  But there was never like anybody that wanted to— |
| HENDRICKS: | To stop and said no? |

15

| R. HUCKABAY: | Yeah, to stop, and just like wanted—I mean most of the time they stayed the night or— |
| HENDRICKS: | Okay. |
| R. HUCKABAY: | —kept calling him afterwards or whatever.  But I didn't really associate with them ever again. |
| HENDRICKS: | So the understanding between him and woman [sic] was that you—another female was already—always gonna participate, and that was what the women wanted? |
| R. HUCKABAY: | Um, yeah, . . . in my situation that was . . . always the situation. |

Counsel sought to admit that statement, and other similar statements, arguing they indicated that, contrary to Huckabay's testimony, Johnson did not use force to get women to have sex with him, including with Terri.  The trial court denied counsel's request, stating,

> [I]t is clear from this context that the detective is asking her about the consensual three-way, women he found on the Internet and that that's what Huckabay is responding to.  And frankly, I told you about this before, but I think that this would be a misrepresentation to the jury and it's fraudulent and I'm not going to allow it.

After defense counsel pointed to numerous excerpts of the transcript, all of which the trial judge found to be made in the context of consensual group sex, the court stated, "I should for the record make a 352 analysis of this.  I'm going to find that the danger of misleading the jury on this is huge and so that the prejudicial effect far outweighs the probative value."

As an initial matter, "[i]ncorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal constitutional rights are affected." *Lincoln v. Sunn*, 807 F.2d 805, 816 (9th Cir. 1987).  Likewise, even if the trial court erred in its application of §§ 352 and 1108, such error is not a ground for federal habeas relief.  *See Estelle*, 502 U.S. at 67-68.

Indeed, Johnson cannot demonstrate that the trial court committed error when it excluded the prior statements.  A review of the record reveals that the trial court's denial of Johnson's

16

request to admit the statement was proper, and thus neither unreasonable or contrary to federal

law, because the interview questions asked Huckabay about consensual group sex encounters she

had with Johnson.  As the trial court noted, prior to the statements proffered by the defense (and

in a section of the transcript not attached to Johnson's Petition), Detective Hendricks told

Huckabay, "So let's say there's a woman that wants to have a threesome."  And because the

proffered evidence did not contradict Huckabay's testimony and was therefore not relevant,

Johnson cannot demonstrate that its exclusion violated his right to confrontation.  *See Wood*, 957

F.2d at 1550 (no constitutional violation where the evidence excluded is not relevant).

Moreover, the record reflects that the trial court properly weighed the evidence against its

potential to cause prejudice and concluded that the risk of prejudice outweighed any probative

value because it could confuse the issues and mislead the jury.  Accordingly, Johnson is not

entitled to relief on this claim.

        iii.      Victims' Prior Sexual Activity (Fourth Error)

Johnson further alleges that the trial court erred in excluding "significant impeachment

evidence" of both victims, "including willingness to engage in casual sex."

California Evidence Code § 1103 governs the admissibility of a rape victim's prior

sexual history.[4]  *People v. Chandler*, 65 Cal. Rptr. 2d 687 (Cal. Ct. App. 1997).  The California

---

[4]      Section 1103(a)(1) provides that "evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim . . . is not made inadmissible by Section 1101 if the evidence is . . . [o]ffered by the defendant to prove conduct of the victim in conformity with the character or trait of character." Cal. Evid. Code § 1103(a)(1).

The foregoing subsection is limited by § 1103(c)(1), which provides in relevant part that in rape cases, "opinion evidence, reputation evidence, and evidence of specific instances of the complaining witness' sexual conduct, or any of that evidence, is not admissible by the defendant

Legislature amended § 1103 to prevent a rape victim from being questioned extensively about any prior sexual history without a showing such questioning was relevant, reasoning that fear of personal questions would deter victims from filing complaints, thus resulting in a lower rate of reported rapes. *People v. Casas*, 226 Cal.Rptr. 285 (Cal. Ct. App. 1986).  As a result, § 1103(c) provides that a rape defendant cannot introduce opinion evidence, reputation evidence, and evidence of specific instances of the alleged victim's previous sexual conduct with persons other than the defendant to prove the victim consented to the sexual acts alleged.  CAL. EVID. CODE § 1103(c).  But because a victim's credibility is virtually always an issue in sexual assault cases, § 782 provides a procedure requiring an *in camera* review of the proffered evidence to diminish the potential abuse of § 1103(c)(4).  *See* CAL. EVID. CODE § 782.  Thus, the defense may offer evidence to attack the victim's credibility through prior sexual conduct if, after a hearing, the trial court concludes that the proffered evidence's prejudicial effect is substantially outweighed by its probative value under§ 352.  *Chandler*, 65 Cal. Rptr. 2d at 690.

In this case, Johnson argues that evidence of the victims' "willingness to engage in casual sex" is "highly probative and necessary to allow [him] to present a complete defense and to confront the witnesses against him."  The Court of Appeal rejected this claim on direct appeal on the following grounds:

> Here, [Johnson] sought to introduce evidence that the victims had sex with strangers in order to show they had consensual sex with him.  But he did not show any distinctive modus operandi in their prior sexual encounters that would tend to make the evidence relevant on some noncharacter theory.  Whether the women were promiscuous was irrelevant.  [Johnson] did not submit a sworn statement attesting to the fact that the women were known to have sex in public, with a man they had just met on the street.  (*People v. Steele*, *supra*, 210 Cal.App.3d at pp. 75-76 [the fact that the victim engaged in

in order to prove consent by the complaining witness."  *Id.* § 1103(c)(1).

18

intercourse with a stranger in a vehicle the day before the alleged offense suggests a predisposition to have sex with strangers in vehicles and casts doubt on her testimony of being forcibly abducted and sexually abused, but one prior instance of intercourse under vaguely parallel circumstances fell short of indicating a modus operandi.)  [Johnson] simply wished to go on a fishing expedition into the victims' sexual histories.

The trial court correctly determined that [Johnson] did not present sufficient evidence of a permissible use of the victims' sexual background to warrant a . . . hearing.

*Johnson*, 2010 WL 1692165, at *10-11.

The Court of Appeal's rejection of Johnson's claim is fully consistent with federal law. In *Lucas*, the Supreme Court recognized that a defendant's Sixth Amendment rights may be constitutionally limited by a rape shield statute.  500 U.S. at 149.  "To the extent that [the rape shield statute] operates to prevent a criminal defendant from presenting relevant evidence, the defendant's ability to confront adverse witnesses and present a defense is diminished.  This does not necessarily render the statute unconstitutional."  *Id.*  While a defendant's rights may be narrowed, the Court remarked that such restrictions "'may not be arbitrary or disproportionate to the purposes they are designed to serve.'"  *Id.* at 151 (quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)).

Johnson cannot show that the trial court's exclusion was arbitrary or that the impairment on his confrontation rights was disproportionate to the victims' or the state's interests.  The general promiscuity evidence that Johnson sought to offer is precisely the type of evidence that the California Legislature sought to exclude.  In adopting § 1103, the California Legislature recognized that evidence of the alleged victim's consensual sexual activities with others has little relevance to whether consent was given in a particular instance.  *Chandler*, 65 Cal.Rptr.2d at 690.  The Ninth Circuit has similarly held that "a rape victim's sexual history with others only

goes to show a generalized attitude toward sex that says little if anything about the victim's attitude towards sex with the defendant." *Wood*, 957 F.2d at 1551.

Moreover, a state passing a rape shield law makes a "valid legislative determination that rape victims deserve heightened protection against surprise, harassment, and unnecessary invasions of privacy." *Anderson v. Morrow*, 371 F.3d 1027, 1030 (9th Cir. 2004) (internal quotation marks and citation omitted). Given the weak probative value of the offered evidence, and the compelling interests served in excluding such evidence, Johnson cannot show that his rights to present a defense and confront his witnesses were unconstitutionally infringed by the court's ruling. The state courts' rejection of his claim neither contravened or unreasonably applied federal law, and Johnson is not entitled to relief on this claim.

     B.     *Hampered Communications with Counsel (Third Error)*

Johnson next contends that the trial court "would not allow [him] to talk with his attorney at defense table, therefore Petitioner was unable to assist with his own defense, which denied Petitioner a fair trial." But Johnson does not allege any specific instances in which the court restricted him from speaking with his attorney. Nor does he explain what he would have communicated to his attorney had he the ability to do so, or how that communication would have impacted his case. Consequently, Johnson is not entitled to relief on this vague and conclusory claim. *See Blackledge v. Allison*, 431 U.S. 63, 75 (1977) ("The allegations in this case were not in themselves so vague (or) conclusory as to warrant dismissal for that reason alone.") (internal citations and quotation marks omitted).

C.     *Erroneous Instructions (Fifth and Ninth Errors)*

Johnson also claims that the trial court erroneously instructed the jury with regard to two issues: other crimes theory (fifth error) and simple kidnapping (ninth error).

Claims of error in state jury instructions are generally a matter of state law and do not usually invoke a constitutional question. *Gilmore v. Taylor*, 508 U.S. 333, 342-343 (1993). "Claims that merely challenge the correctness of jury instructions under state law cannot reasonably be construed to allege a deprivation of federal rights." *Van Pilon v. Reed*, 799 F.2d 1332, 1342 (9th Cir. 1986); *see also Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005) ("Any error in the state court's determination of whether state law allowed for an instruction . . . cannot form the basis for federal habeas relief.").

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990).  A jury instruction violates due process only if "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  It is not sufficient to show that "the instruction is undesirable, erroneous, or even 'universally condemned.'" *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp*, 414 U.S. at 154).

It is also well-established that the challenged instruction may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72.  The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment. *Francis*

*v. Franklin*, 471 U.S. 307, 309 (1985). This Court must also bear in mind that the Supreme

Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury

applied the challenged instruction in a way that violates the Constitution and that the category of

infractions that violate "fundamental fairness" is very narrowly drawn. *Id.* at 72-73. "Beyond

the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited

operation." *Id*. at 73 (citation omitted). Where the defect is the failure to give an instruction, the

burden is even heavier because an omitted or incomplete instruction is less likely to be

prejudicial than an instruction that misstates the law. *See Henderson*, 431 U.S. at 155. In those

cases, the inquiry is whether the trial court's refusal to give the requested instruction "so infected

the entire trial that the resulting conviction violates due process." *See id.* at 156-57; *Estelle*, 502

U.S. at 72.

> i.      Instruction on Other Crimes Theory (Fifth Error)

Johnson contends that the trial court erred when it instructed the jury as to how it could

consider evidence that Johnson asked Huckabay and his ex-wife to engage in "threesome" sexual

encounters with a female stranger. The record indicates that the trial court ruled that it would

instruct the jury that it could consider the evidence regarding group sex in determining whether

Johnson had a motive, plan, or scheme to commit the sexual assault on Terri.

The court ultimately instructed the jury on the limited purposes for which it could

consider the evidence:

> The People presented evidence through witness Roni Huckabay and witness Julie
> Johnson that [Johnson] previously expressed that he wanted "threesome" sexual
> encounters with himself, his dating/marriage partner and a third party female relative
> stranger.

22

You may consider this evidence only if the People have proved a preponderance of the evidence that [Johnson] in fact committed the acts . . . .  If the People have not met this burden, you must disregard this evidence entirely.

If you decide that [Johnson] previously expressed that he wanted those acts, or engaged in those acts, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not [he] had a motive, plan or scheme to commit the offenses alleged in this case against Terri Doe in 2000.

Do not consider this evidence for any other purpose.

Do not conclude from this evidence that [Johnson] has a bad character or is disposed to commit crime.

If you conclude that [Johnson] previously expressed that he wanted "threesome" sexual encounters with himself, his dating/marriage partner and a third-party female relative stranger, that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that [Johnson] is guilty of the charged crimes relating to Terri Doe.

The People must still prove each element of every charge beyond a reasonable doubt.

Johnson contends that the trial court erred by instructing the jury as to plan or scheme because his requests for consensual group sex could not be used to infer that he had a common scheme or plan to commit a sexual offense assault to achieve group sex by force.  According to Johnson, "improper expansive consideration of this irrelevant and inflammatory type evidence improperly reduced the prosecution's burden of proof on key credibility issues and created a strong risk Petitioner would be convicted based upon the irrelevant and inflammatory evidence of life style or disposition, rather than upon the facts."

But as the Court of Appeals concluded on direct appeal, there is no likelihood that the jury applied this instruction in the manner suggested by Johnson.  As the appellate court ruled:

[Johnson] misconstrues the meaning and effect of the court's instruction.  It did not tell the jury that his attack on Terri could be viewed as part of a common scheme or plan to engage in forcible threesomes.  It simply advised the jurors that if they found defendant had previously expressed that he wanted threesome sexual encounters with a relative stranger, they could consider the evidence for the limited purpose of deciding whether [Johnson] had a motive, plan or scheme to commit the offenses involving Terri.

*Johnson*, 2010 WL 1692165, at *22.

This is particularly true in light of the other instructions given.  Here, the jury was instructed that: 1) it could not use the evidence for any other purpose; 2) it could not conclude from the evidence that Johnson has a bad character or is disposed to commit crime; 3) it was not sufficient by itself to prove Johnson guilty of the crimes relating to Terri; and 4) the prosecution still had the burden of proving each element of every charge beyond a reasonable doubt.  A jury is presumed to follow the instructions it is given.  *See, e.g., Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions").  This Court must therefore presume in the absence of evidence to the contrary that the jury was able to correlate, follow, and understand the trial court's instructions.

Moreover, the Court of Appeal was not unreasonable in concluding that the evidence supported such an instruction.  As that court stated, "The jury could also use this evidence as indicating that [Johnson] had a plan or scheme to achieve this desire, in light of Huckabay's testimony that [Johnson] stated he wanted to pick up a prostitute, drove around looking for someone, stopped when he saw Terri, and then accosted her, all of which indicated a plan to find a female with whom to have a threesome."  *Johnson*, 2010 WL 1692165, at *22.  Johnson cites to no federal law, and this Court is unaware of any, that the state appellate court's reasoning either contravened or unreasonably applied.  Indeed, federal courts have consistently upheld the admission of evidence to prove a specific issue in dispute such as motive, intent, identity, or a common plan or scheme.  *See, e.g.*, *Boyde v. Brown*, 404 F.3d 1159, 1172-73 (9th Cir. 2005) (common plan or scheme); *Windham v. Merkle*, 163 F.3d 1092, 1103-04 (9th Cir. 1998) (motive).

Finally, Johnson cannot show that any instructional error "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see Hedgpeth v. Pulido*, 555 U.S. 57, 62 (2008) (per curiam) (applying *Brecht* harmless error analysis to instructional error claim on federal habeas review).[5] Even if his requests for Julie and Huckabay to participate in group sex were not admissible to prove his common plan or scheme, Johnson does not dispute that the requests were admissible to prove his motive, and thus the alleged instructional error had no impact on the evidence presented at trial. Likewise, as previously discussed, the court instructed the jury that it was "not required to" consider the evidence for the purpose of determining whether Johnson had a plan or scheme but was prohibited from concluding that Johnson "has a bad character or is disposed to commit a crime." For these reasons, even assuming that the limiting instruction was erroneous, it did not have a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 638, and the Court is without "grave doubt as to the harmlessness of [the] error," *Deck*, 768 F.3d at 1022 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995)). Johnson therefore cannot prevail on this instructional error claim.

        ii.      Simple Kidnapping Instruction (Ninth Error)

Johnson also argues that he is entitled to federal habeas relief due to the court's erroneous instruction regarding the asportation element of the simple kidnapping charge. In *People v.*

---

       [5]      Where the *Brecht* standard of prejudice applies, federal courts apply *Brecht* "'without regard for the state court's harmlessness determination.'" *Deck v. Jenkins*, 768 F.3d 1015, 1022 (9th Cir. 2014)(quoting *Pulido v. Chrones*, 629 F.3d 1007, 1012 (9th Cir. 2010)). The *Deck* court explained that "AEDPA deference to the [state court's] harmlessness determination is already subsumed within the *Brecht* standard." *Id.* at 1024 (citing *Fry v. Pliler*, 551 U.S. 112, 120 (2007))

*Caudillo*, 580 P.2d 274 (Cal. 1978), the California Supreme Court affirmed that, as an element of the offense of kidnapping, the victim must be moved a distance that is "substantial in character." The court held that the only factor relevant to the determination of this asportation element was the actual distance involved. *Id.* at 279-81. Subsequently, in *People v. Martinez*, 973 P.2d 512 (Cal. 1999), the California Supreme Court overruled *Caudillo*, holding that factors other than actual distance may be relevant to the asportation element of kidnapping:

> [I]n determining whether the movement is "substantial in character". . . the jury should consider the totality of circumstances. Thus, in a case where the evidence permitted, the jury might properly consider not only the actual distance the victim is moved, but also such factors as whether that movement increased the risk of harm above that which existed prior to the asportation, decreased the likelihood of detection, and increased both the danger inherent in a victim's foreseeable attempts to escape and the attacker's enhanced opportunity to commit additional crimes.

*Martinez*, 973 P.2d at 520.

Here, the trial court instructed the jury that it was required to consider the totality of circumstances in determining whether Johnson satisfied the asportation element of simple kidnapping as to both Virginia and Terri and thus accurately described the law applicable only to simple kidnappings occurring after *Martinez*. However, because the offenses involving Virginia occurred before *Martinez*, which explicitly held that its decision could not be applied retroactively, *Martinez*, *id.* at 521, the instruction misstated the law on the counts and special allegations involving the simple kidnapping of Virginia. On direct appeal, the People conceded the error, and the Court of Appeal reversed the conviction on count 5 as well as the § 667.61(e)(1) allegations involving Virginia which were attached to it. *Johnson*, 2010 WL 1692165, at *24. However, the Court of Appeal rejected Johnson's claim that the § 667.61(d)(2) allegations also had to be reversed:

Resolution of this question depends on whether section 667.61, subdivision (d)(2) incorporates the asportation element of simple kidnapping (Pen. Code, § 207, subd. (a)) or whether it incorporates the asportation element of aggravated kidnapping to commit a specified sexual offense (Pen. Code, § 209, subd. (b)).

In *People v. Rayford* (1994) 9 Cal.4th 1 (hereafter *Rayford*), which concerned aggravated kidnapping to commit a robbery, the California Supreme Court addressed the requisite standard of asportation for the substantive offense of aggravated kidnapping. *Rayford* concluded that, unlike the standard for simple kidnapping, aggravated kidnapping required movement of the victim that was not merely incidental to the underlying crime of robbery or rape, and the movement had to substantially increase the risk of harm over and above that necessarily present in the crime of robbery or rape. (*Id.* at pp. 12, 22.)  Because *Rayford* concluded that aggravated kidnapping to commit a robbery or rape had this heightened standard, it declined to address whether *Caudillo's* rejection of certain factors other than the actual distance traveled should be revisited. (*Id.* at p. 22.)

The standard set forth in *Rayford* was in effect at the time [Johnson] sexually assaulted Virginia, and the standard is codified in Penal Code section 209 (*Martinez*, supra, 20 Cal.4th at p. 232, fn.4), which states kidnapping for purposes of a sexual offense requires "movement of the victim . . . beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense."  (Pen.Code, § 209, subd. (b)(2).)

Section 667.61 provides for an increased penalty where the defendant committed forcible rape, oral copulation, or sexual penetration and "[t]he defendant kidnapped the victim of the present offense and the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense . . . ."  (§ 667.61, subd. (d).)  It, too, incorporates the aggravated kidnapping standard approved by *Rayford*.

Thus, we agree with the People that the allegations under section 667.61, subdivision (d)(2) incorporate the standard of aggravated kidnapping existing at the time [Johnson] committed the offense, which means the instructional error with respect to simple kidnapping did not affect the verdict as to these allegations.  Thus, despite our striking the allegations under section 667.61, subdivision (e)(1), [Johnson] remains subject to a sentence of 25 years to life for kidnapping Virginia and forcing her to orally copulate him.

Johnson, 2010 WL 1692165, at *25.

In the instant Petition, Johnson argues that the enhancement allegations under

§ 667.61(d)(2) also must be reversed.  But, again, "the fact that [an] instruction was allegedly

incorrect under state law is not a basis for habeas relief."  *Estelle*, 502 U.S. at 71-72.  This Court

is bound by the state appellate court's determination that, under California law, the allegations of

§ 667.61(d)(2) incorporate the aggravated kidnapping standard existing at the time of the offenses at issue. *See Horton v. Mayle*, 408 F.3d 570, 576 (9th Cir. 2005) ("If a state law issue must be decided in order to decide a federal habeas claim, the state's construction of its own law is binding on the federal court."). Johnson fails to establish a due process violation here because he may not transform his state instructional error claim into a federal claim by simply asserting a violation of his constitutional rights. *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996) (a petitioner cannot transform a state-law issue into a federal one by simply asserting a due process violation); *see also Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988) (an instructional error "does not alone raise a ground cognizable in a federal habeas corpus proceeding") (citation omitted). Johnson is therefore not entitled to relief on this instructional error claim either.

D.    *Erroneous Rulings regarding Loss of Evidence (Sixth Error)*

Johnson additionally contends that the trial court erred in denying his motion to dismiss or issue sanctions after the prosecution lost the surveillance videotape and photographs of the area behind the convenience store where Virginia was allegedly assaulted. On direct appeal, the Court of Appeal recounted the following facts underlying Johnson's claim:

> In the trial court, [Johnson] argued that the videotape had an exculpatory value because he could use it to impeach Virginia's recollection of the events in the following ways: (1) Virginia stated the black Thunderbird entered the parking lot twice, but the videotape showed the car entered the lot only once; (2) it did not show Virginia running across the parking lot to her car after the attack; (3) the videotape timestamp showed that she arrived at the convenience store at 4:58 a.m. and left 13 minutes later at 5:11 a.m., thus contradicting her claim that she was assaulted for 20 to 25 minutes; (4) the timestamp undermined Virginia's claim that she immediately called 9-1-1 when she arrived at the gas station one block away (she did not call 9-1-1 until 5:20 a.m.); and (5) no assault was observed on the videotape. At the hearing, [Johnson] also stated the photographs of the dumpsters taken at 12:00 p.m. following the assault showed they were flush with the building, which undermined Virginia's statement about the position of the dumpsters. [Johnson] argued that he did not need to show bad faith by the police in destroying the evidence because the videotape and photographs possessed an exculpatory

28

value that was apparent before the evidence was lost or destroyed, and was of such a nature that he would be unable to obtain comparable evidence by other reasonably available means.

The trial court ruled that the evidence was material but only potentially exculpatory. The impeachment value could not have been known until after Virginia testified about certain details in a way that did not comport with the missing evidence. In addition, those details were not significant to the extent they would alert law enforcement that the tape might be exculpatory. Therefore, the exculpatory value of the evidence was not known to law enforcement at the time it was destroyed or lost. Furthermore, Detective James's detailed notes about the videotape and Officer Craig Goncalves's report describing the location of the dumpsters were sufficiently comparable evidence that enabled [Johnson] to impeach Virginia's recollection of the events.

Accordingly, the court denied the motion to dismiss and declined to impose any sanctions.

*Johnson*, 2010 WL 1692165, at *5-6.

The Court of Appeal upheld the trial court's ruling on the following grounds:

[Johnson] contends the court's ruling that the exculpatory significance of the evidence was not apparent to law enforcement at the time is incorrect because the officers interviewed Virginia and made careful notes. However, [Johnson] does not support his claim with any evidence in the record disclosing the officers were aware of the alleged inconsistencies between Virginia's account and the videotape and photographs, other than her statement to them that the assault lasted 15 to 20 minutes, when it actually lasted less than 13 minutes.

This disparity is not that significant given the fact that Virginia, who was traumatized, was estimating the amount of time she endured what probably seemed like an endless attack to her. Indeed, none of the inconsistencies defendant claims undermine Virginia's testimony were significant; *i.e.*, they did not have a significant exculpatory value. She may have been mistaken about the number of times the Thunderbird entered the parking lot and her time estimates may have been marginally wrong. However, the videotape and photographs did not demonstrate that [Johnson] did not assault Virginia. As Detective James explained, the camera mounted inside the store had only a limited view of the parking lot and the pay phones were not visible on the videotape.

[Johnson] complains that the officers' notes and report were no substitute for the visual evidence, which the jurors should have been able to see in order to decide for themselves what occurred. But merely claiming that the notes and report were no substitute is not a convincing argument that they were ineffective for impeachment purposes—the reason for which [Johnson] wanted the videotape and photographs. He points to no evidence that he was unable to show the inconsistencies in Virginia's testimony via the officers' testimony about their notes and report.

In sum, he fails to demonstrate there was no substantial evidence to support the trial court's ruling.

*Id.* at *6 (citation omitted).

Due process standards require that criminal defendants be afforded a meaningful opportunity to present a complete defense, including "what might loosely be called the area of constitutionally guaranteed access to evidence." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982). It is a violation of a criminal defendant's right to due process when law enforcement agencies fail to preserve evidence that "possess[es] an exculpatory value that was apparent before the evidence was destroyed and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably attainable means." *California v. Trombetta*, 467 U.S. 479, 489 (1984). Due process only requires preservation of "evidence that might be expected to play a significant role in the suspect's defense." *Id.* at 488. Furthermore, the destruction of potentially exculpatory evidence does not violate the Constitution unless the evidence was destroyed in bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

In his Petition, Johnson disputes the state courts' determination regarding the evidence's exculpatory value, again arguing that the lost evidence would have shown no sign of a crime and would have established that Virginia's testimony about the incident was untruthful. But as the United States Supreme Court has made clear, "habeas corpus is not to be used as a second criminal trial, and federal courts are not to run roughshod over the considered findings and judgments of the state courts that conducted the original trial and heard the initial appeals." *Williams*, 529 U.S. at 383. Here, it is evident from the record that the state courts fully litigated the *Trombetta* issue, both at the trial level and on appeal, and were in agreement that no constitutional violation had occurred under the appropriate state and federal standards. Johnson has presented no argument in these proceedings nor pointed to any evidence or circumstance that

would justify this Court on habeas review running "roughshod" over the considered findings and rulings of the state courts in this case. Johnson thus cannot prevail on this claim.

     E.    *Prejudicial Admission of Uncharged Sexual Conduct (Seventh Error)*

Johnson additionally argues that his constitutional rights were violated when the trial court allowed pursuant to California Evidence Code § 1108 evidence that, while they were married, Johnson attempted to force his ex-wife Julie to orally copulate him at gunpoint.

California Evidence Code § 1108 allows the prosecution to prove a defendant's propensity to commit sex crimes by offering evidence that he has committed other sex crimes. It is an exception to the general rule, reflected in § 1101, that propensity evidence is not admissible. *See* CAL. EVID. CODE §§ 1101(a), 1108(a). The relevant portion of § 1108 provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." Section 352, which is incorporated into § 1108, allows for the exclusion of otherwise probative evidence if it will consume unnecessary time, create the danger of undue prejudice, confuse the issues, or mislead the jury. CAL. EVID. CODE § 352. Section 1108 is analogous to Federal Rule of Evidence 413, which provides that, "[i]n a criminal case in which a defendant is accused of a sexual assault, the court may admit evidence that the defendant committed any other sexual assault." FED. R. EVID. 413(a). Similarly, as noted *supra*, § 352 is the equivalent of Federal Rule of Evidence 403.

As an initial matter, Johnson cannot prevail on this claim because, again, "[i]ncorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal constitutional rights are affected." *Lincoln*, 807 F.2d at 816. Thus, even if the trial court erred in

its application of §§ 352 and 1108, such error is not a ground for federal habeas relief.  *See Estelle*, 502 U.S. at 67-68.  Indeed, Johnson cannot demonstrate that the trial court committed error.  The record reflects that the trial court properly weighed the evidence against its potential to cause prejudice and instructed the jury that it may, but was not required, to infer from the evidence that he had a disposition to commit sexual offenses.  The trial court further instructed the jury that the proffered evidence could only be considered for that limited purpose.

Moreover, the Ninth Circuit has repeatedly barred federal habeas petitioners from challenging the constitutionality of prior sexual misconduct evidence admitted to show propensity pursuant to § 1108.  *See, e.g., Greel v. Martel*, 472 F. App'x 503, 504 (9th Cir. 2012) ("Ninth Circuit precedent 'squarely forecloses [the] argument' that admission of evidence of sexual misconduct to show propensity violates due process.") (quoting *Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008)); *Sanches v. Hedgpeth*, 381 F. App'x 710, 711 (9th Cir. 2010) ("[T]he Supreme Court has never held that the admission of prior sexual misconduct to lend credence to a victim's claims to be unconstitutional."); *Mejia*, 534 F.3d at 1046 (on AEDPA review, upholding admission of evidence of prior uncharged sexual offenses in support of rape charges).  In so holding, the Ninth Circuit has cited the United States Supreme Court's express refusal to decide the issue.  *See Estelle*, 502 U.S. at 75 n.5 ("Because we need not reach the issue, we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime.").

And because the Supreme Court has never held § 1108 to be unconstitutional, this Court must reject Johnson's related claim challenging the constitutionality of § 1108 itself.  *See Carey*, 549 U.S. at 77.  Indeed, the lower courts that have considered the constitutionality of § 1108—or

32

its federal counterpart, Federal Rule of Evidence 414—have upheld it.  *See, e.g.*, *United States v. LeMay*, 260 F.3d 1018, 1027 (9th Cir. 2001) (rejecting a constitutional challenge to Rule 414); *Renella v. Adams*, No. C 05-2250, 2007 WL 963969 at *3-4 (N.D. Cal. Mar. 30, 2007) (rejecting a constitutional challenge to § 1108); *People v. Falsetta*, 986 P.2d 182 (Cal. Ct. App.1999) (same).  Johnson is therefore not entitled to relief on this claim.

F.      *Failure to Hold Marsden Hearing (Eighth Error)*

Johnson further alleges that the trial court erred when it did not conduct a *Marsden* hearing following Johnson's request to fire his attorney before the first trial.  The Court of Appeal considered and rejected this claim on direct appeal as follows:

>     Assistant Public Defender David Lynch represented [Johnson] throughout the first and second trial.  However, on a few occasions between the preliminary hearing and the first trial, a different public defender appeared for Lynch due to scheduling conflicts.
>     On May 2, 2007, Assistant Public Defender Jennifer Schiavo appeared on his behalf before Judge Hom.  [Johnson] stated, "I want to fire my attorney, that's what I'm in the process of doing.  I'm [sic] been here eight months, this is why."  The court responded it would deal with the issue later because Lynch was not present.  [Johnson] complained that Lynch had not been there for his last four hearings.  The court and Schiavo explained that Lynch was engaged in another trial.  The court continued the matter until May 9, 2007, at which time "we can potentially resolve the issue regarding Mr. Lynch's representation.  And Ms. Schiavo will convey your desires."
>     Lynch appeared with [Johnson] at the next hearing, at which time no one made any reference to [Johnson's]  desire to fire him.  [Johnson] points to nothing in the record indicating he reiterated his wish to fire Lynch at any time prior to or during the first trial, at which Judge Nunley presided.  On December 3, 2007, the court declared a mistrial based on the jury's inability to reach a unanimous verdict.  At that time, the prosecutor immediately expressed her intention to retry the case.  [Johnson] points to nothing in the record indicating he expressed any dissatisfaction with Lynch at any time between the first and second trial, or during the second trial, at which Judge Marlette presided.  At the first proceeding, Judge Marlette twice asked if there were any outstanding issues that needed to be addressed.  Lynch indicated there were no issues, and [Johnson] did not contradict him.
>     The People argue [Johnson] abandoned his *Marsden* claim by failing to reassert it at the next hearing or at any other time.  They rely on *People v. Vera* (2004) 122 Cal.App.4th 970, in which the trial court held a *Marsden* hearing, denied it without prejudice because of time pressures, and offered the defendant an opportunity to renew

the motion in the future to state his remaining complaints about counsel.  (*Id.* at pp. 976-977.)  The defendant failed to do so, and the appellate court interpreted this as an abandonment of his unstated complaints, observing that if a defendant's conduct could amount to abandonment of the right to self-representation (*People v. Kenner* (1990) 223 Cal.App.3d 56, 59), then there was no reason his conduct could not be construed as an abandonment of his request to substitute counsel.  (*People v. Vera*, *supra*, at pp. 981-982.)

Here, the record discloses the court did not deprive [Johnson] of the opportunity to address the reasons for his *Marsden* motion; it simply delayed the matter for another day.  When that day came, [Johnson] did not raise the subject again, did not state he still wanted to discharge counsel, and did not seek to explain reasons for discharging counsel.  Furthermore, his first trial ended in a mistrial.  At the start of the second trial, Judge Marlette specifically asked if there were outstanding issues that needed to be addressed.  [Johnson] said nothing and silently accepted counsel's assistance throughout the entire second trial.

Because [Johnson's] conduct demonstrates he had abandoned his request for new counsel, the court did not err in not conducting a *Marsden* hearing.  (*People v. Vera*, *supra*, 122 Cal.App.4th at p. 982.)

*Johnson*, 2010 WL 1692165, at *27-28.

The Sixth Amendment right to counsel guarantees to an accused the concomitant rights to conflict-free representation and the effective assistance of counsel.  *See Wheat v. United States*, 486 U.S. 153, 156 (1988); *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  These rights may be infringed if an accused and his counsel become embroiled in an "irreconcilable conflict." *See Stenson v. Lambert*, 504 F.3d 873, 886 (9th Cir. 2007) ("[F]orcing a defendant to go to trial with an attorney with whom he has an irreconcilable conflict amounts to constructive denial of the Sixth Amendment right to counsel." (citing *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970) ("[T]o compel one charged with [a] grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever.")); *see also Daniels v. Woodford*, 428 F.3d 1181, 1197 (9th Cir. 2005).

However, "not every conflict or disagreement between the defendant and counsel implicates Sixth Amendment rights." *Schell v. Witek*, 218 F.3d 1017, 1027 (9th Cir. 2000) (en banc) (citing *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983)).  The Sixth Amendment does not require or guarantee, implicitly or otherwise, that an attorney-client relationship be "meaningful" or free of discord.  *Morris*, 461 U.S. at 13-14; *see Plumlee v. Masto*, 512 F.3d 1204, 1211 (9th Cir. 2008) (en banc) ("[Petitioner] has cited no Supreme Court case—and we are not aware of any—that stands for the proposition that the Sixth Amendment is violated when a defendant is represented by a lawyer free of actual conflicts, but with whom the defendant refuses to cooperate because of dislike or distrust.").  Rather, an asserted conflict crosses the constitutional threshold "only where there is a complete breakdown in communication between the attorney and client, and the breakdown prevents effective assistance of counsel."  *Stenson*, 504 F.3d at 886 (citing *Schell*, 218 F.3d at 1026); *see also Daniels*, 428 F.3d at 1197 (the nature and extent of the conflict must be such as to "deprive[] the defendant of representation guaranteed by the Sixth Amendment." (citing *Schell*, 218 F.3d at 1027)).

Here, the record fully supports the Court of Appeal's conclusion that Johnson abandoned his request for substitution of counsel.  By failing to pursue his initial request for substitute counsel despite invitation to do so, Johnson effectively abandoned the request, and the trial court had no duty to hold a *Marsden* hearing.  *See Brown v. Walker*, No. C 09-4663, 2011 WL 4903085, at *6-7 (N.D. Cal. Oct. 14, 2011).  In any event, the question before this Court on federal habeas review is whether the trial court's failure to hold a hearing on Johnson's initial statement that he wished to fire his attorney violated the Sixth Amendment in that a conflict between Johnson and his trial counsel "had become so great that it resulted in a total lack of

communication or other significant impediment." *Schell*, 218 F.3d at 1026.  Johnson fails to make such a showing.  Although he at some point stated that he wanted to "fire" his trial counsel, he did not repeat that request at the next hearing or any time thereafter, even when asked whether there were issues to resolve.  On the contrary, Johnson proceeded through both the first and second trial represented by that trial counsel without protest or complaint.  Those actions belie any argument that Johnson and his trial counsel had an irreconcilable conflict, and Johnson fails to provide any evidence in the instant Petition that would establish a complete breakdown of communication.  Johnson is therefore not entitled to relief on this claim, and he cannot prevail on any of the alleged trial court errors he raises in support of his first ground.

Ground 2. Prosecutorial Misconduct

Johnson next argues that the prosecutor committed prejudicial misconduct.  Federal habeas review of prosecutorial misconduct claims is limited to the narrow issue of whether the alleged misconduct violated due process. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  To prevail on such a claim, a petitioner must show that the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  Moreover, "[o]n habeas review, constitutional errors of the 'trial type,' including prosecutorial misconduct, warrant relief only if they 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht*, 507 U.S. at 637-38 (1993)).

In support of this ground, Johnson first claims that the prosecution charged him with crimes that fell outside the 3-year statute of limitations, which "in a sen[s]e stacked the deck against" him and denied him equal protection and a fair trial.  As the Court of Appeal concluded,

the only charge that was filed outside of the applicable statute of limitations was the robbery charge (count 5), the conviction of which the Court of Appeal properly vacated.  To the extent that Johnson claims that the prosecutor charged him with that crime in order to manipulate the proceedings against him, such claim must fail because Johnson alleges no statement of specific facts as to how the prosecutor maliciously filed those charges because of some discriminatory, vindictive, or otherwise improper motive.  Moreover, the filing of that charge was not a post-conviction action but rather a pretrial decision, which is presumptively lawful, and a prosecutor has wide discretion in enforcing the law and may proceed zealously.  *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 807 (1987); *cf. Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) ("In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.").

Johnson also contends that the prosecutor "erroneously commented" on the defense's theory during closing argument when she stated, "I suspect [the] defense might stand up here and try to tell you a story about consent anyway."  A prosecutor's comments in summation constitute grounds for reversal only when the remarks caused actual prejudice.  *Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004) (applying harmless error test to claim of prosecutorial misconduct in summation).  Likewise, a prosecutor must have "reasonable latitude" to fashion closing arguments.  *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991).  Here, in light of the record and the instructions as a whole, it appears that the statement was a fair comment on the evidence suggesting that the encounter was not consensual.  In considering the context in which it was made, it is clear that the prosecutor's remark was not intended as evidence, nor could it

37

reasonably have been interpreted as such.  Moreover, Johnson cannot show that it was

prejudicial to the point of denying him a fair trial.  *See Darden*, 477 U.S. at 181; *Dubria v.*

*Smith*, 224 F.3d 995, 1004 (9th Cir. 2000) (prosecutor's reference to defense argument as "a

piece of garbage" and defendant as "a liar" not improper).  "While it is clear that prosecutors

cannot express their opinion about a defendant's guilt or vouch for government witnesses, . . . a

prosecutor is free to voice doubt about the veracity of a defendant's story."  *Dubria*, 224 F.3d at

1004 (citations omitted).

Johnson further argues that the prosecutor committed misconduct during summation by

vouching for the credibility of Johnson's ex-wife when she said, "Julie Johnson, her testimony is

the truth.  It's not an appeal to your emotions . . . ."  As previously stated, it is improper for the

prosecution to vouch for the credibility of a government witness.  *United States v. Young*, 470

U.S. 1, 18 (1985).  "Improper vouching typically occurs in two situations: (1) the prosecutor

places the prestige of the government behind a witness by expressing his or her personal belief in

the veracity of the witness, or (2) the prosecutor indicates that information not presented to the

jury supports the witness's testimony."  *United States v. Brooks*, 508 F.3d 1205, 1209 (9th Cir.

2007) (quoting *United States v. Hermanek*, 289 F.3d 1076, 1098 (9th Cir. 2002)).

A prosecutor may, however, argue witness credibility based on the evidence, which is

what the prosecutor did in this case.  *See King v. Schriro*, 537 F.3d 1062, 1068-69 (9th Cir.

2008); *Duckett v. Godinez*, 67 F.3d 734, 742 (9th Cir. 1995) ("prosecutor's assertions regarding

the relative believability of the state and defense witnesses were not representations of his

personal opinion, but inferences drawn from the evidence").  Indeed, the record reflects that the

prosecutor did not make express personal assurances regarding the ex-wife's testimony or imply

that additional information or evidence existed supporting her credibility that hadn't been admitted at trial.

In any event, even if the prosecutor overstepped her bounds by stating that the ex-wife's testimony was the truth, Johnson cannot establish that he was prejudiced by the prosecutor's comment.  The comment was relatively minor in a fairly lengthy closing argument.  The prosecutor also reminded the jury that "what the lawyers say is not evidence," which was reiterated by the trial court's instructions to the jury.  The trial court further instructed the jury that "[y]ou alone must judge the credibility or believability of the witnesses.  In deciding whether testimony is true and accurate, use your common sense and experience."  We must presume that the jury followed these instructions, which helped to ameliorate any possible effects of the prosecutor's isolated statement.  *See Weeks*, 528 U.S. at 234; *Richardson*, 481 U.S. at 206; *see also Comer v. Schriro*, 480 F.3d 960, 988-89 (9th Cir. 2007) (trial court's instructions that lawyers' statements were not evidence, along with prosecutor's warning that his own statements and those of defense counsel were not "proof," significantly limited any prejudice caused by prosecutor's isolated comment).

Johnson likewise contends that a statement made to an alternate juror by the prosecution's investigator violated his rights to an impartial jury and a fair trial.  The record reflects that an alternative juror told the investigator during a break that he was a bouncer at a club where there had been problems with intoxicated men grabbing females sexually and asked the investigator "what kind of a crime it would be."  The investigator "advised him that it could be a sexual battery."  The trial court subsequently removed the alternate juror from the case.  But Johnson fails to provide any authority as to how this conduct could be construed as misconduct

on the part of the investigator, and, more importantly, fails to show how this affected his trial in any way, much less rendered it fundamentally unfair in violation of due process.  His claim that the contact "raises a presumption of prejudice . . . that the jury used the discussion by [the investigator] with the jury alternate to render their verdict" against him is far too speculative to warrant habeas relief.  *See Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (granting habeas relief "on the basis of little more than speculation with slight support" is improper); *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) (denying habeas relief based on speculative assertion of prejudice).

Finally, Johnson alleges that the prosecutor "knowingly used perjured testimony to obtain the conviction" because she "knew or should have known" that Huckabay's testimony regarding Terri's ID, which is discussed further with regard to claim 3, *supra*, was false.  "[T]he [Supreme] Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnotes omitted).  The essential elements of such successful claim are that (1) the testimony is false or perjured, (2) the prosecutor knew that the testimony was false or perjured, and (3) the false testimony was material.  *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc); *see Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Murtishaw v. Woodford*, 255 F.3d 926, 959 (9th Cir. 2001).

Although the prosecutor has a duty to refrain from knowingly presenting perjured testimony, *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002), the record does not support Johnson's contention that the prosecution knowingly introduced the perjured testimony

of Huckabay.  The conflicting discussion of the evidence presented through Huckabay's

testimony, at most, created issues of fact and credibility for the jury to resolve. *Cf. id.*

(distinguishing prosecutorial misconduct in presenting perjured testimony from the presentation

of evidence that included conflicting versions of criminal events).  Moreover, as discussed with

regard to his corresponding ineffective assistance of counsel, *infra*, Johnson had an opportunity

to impeach Huckabay on cross-examination and thoroughly challenge her credibility before the

jury.  These circumstances provide no basis for habeas relief on the ground of prosecutorial

misconduct.  Accordingly, Johnson cannot prevail on any argument advanced in support of his

prosecutorial misconduct claim.

Ground 3. Ineffective Assistance of Counsel

Johnson additionally contends that his trial counsel rendered ineffective assistance of

counsel.  To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a

defendant must show both that his counsel's performance was deficient and that the deficient

performance prejudiced his defense.  466 U.S. at 687.  A deficient performance is one in which

"counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by

the Sixth Amendment."  *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the

outcome might have been different as a result of a legal error, the defendant has established

prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v.

United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95.  Where a habeas

petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice

standard is applied and federal courts do not engage in a separate analysis applying the *Brecht*

standard. *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009). Under this rubric, in reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold." And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Johnson must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different. *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985). An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs. *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one). It is through this highly deferential lens that a federal habeas court reviews *Strickland* claims under the § 2254(d) standard. *See Knowles*, 556 U.S. at 123 (citing *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)).

Johnson first faults counsel for failing to investigate prior to trial the applicable statute of limitations for counts 4, 5, and 7 (robbery and sexual battery counts) as well as the asportation element of count 6 (kidnapping). But as previously discussed, the Court of Appeal already granted relief on the robbery and simple kidnapping counts. Because Johnson already obtained the relief he was seeking from the state court, there is no further relief for this Court to grant.

42

*See Burnett v. Lampert*, 432 F.3d 996, 1000-01 (9th Cir. 2005) (habeas petition is moot when a favorable decision of the court would not offer petitioner any relief); *Blackwell v. Hickman*, Nos. 2:06-cv-1876 & 2:10-cv-2316, 2012 WL 4037503, at *12 (E.D. Cal. Sept. 12, 2012) (rejecting alleging counsel was ineffective for failing to object to improper testimony where state superior court granted habeas relief due to the improper admission).  Moreover, as previously noted, the sexual battery offenses charged in counts 4 and 7 were filed within the 10-year statute of limitations applicable to sex offenses.  *See* CAL. PENAL CODE § 801.1(b) (10-year state of limitations for specified sex offenses); *see also* CAL. PENAL CODE § 803(g) (tolling for DNA "cold case hits" in specified sex cases).  Thus, Johnson cannot show that counsel was ineffective for failing to investigate the statute of limitations applicable to counts 4 and 7 or challenge the counts on that ground.  *See Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir. 2001) (failure to raise a meritless argument does not constitute ineffective assistance).

Johnson also alleges that counsel was ineffective for failing to investigate Terri's ID, which was introduced into evidence by the prosecution, because it would prove false Huckabay's testimony that she identified Terri because Johnson had kept Terri's ID (along with the IDs of other women) by his nightstand.  But the record reflects that during summation defense counsel vigorously attacked Huckabay's testimony on this issue by pointing out that Huckabay testified that she recognized the image from the ID entered into evidence yet that image was taken only a year prior—roughly 8 years after the incident involving Terri.  And, even assuming that further investigation would have provided defense counsel with other means of showing that Huckabay's testimony was false, Johnson cannot show that he was prejudiced by counsel's omission because the record suggests that the particular testimony was not central to the

prosecution's case.  Moreover, the record indicates that defense counsel further undermined Huckabay's credibility by stressing that Huckabay was testifying as part of a plea deal and introducing evidence that Huckabay had engaged in criminal acts of moral turpitude.  Johnson fails to show that further investigation would have caused the jury to view Huckabay's testimony differently, much less that it would have created sufficient doubt as to Johnson's guilt.

Finally, Johnson contends that counsel was ineffective for failing to offer "stronger grounds" challenging the court's preclusion of his proffered impeachment evidence and for failing to obtain an "independ[e]nt expert to evaluate the physical evidence."  But Johnson provides no explanation as to what specifically would constitute stronger grounds or what an independent expert would have testified to that could not be obtained through cross-examination of the prosecution's experts.  *See Blackledge*, 431 U.S. at 75; *Wildman*, 261 F.3d at 839 (speculation that an expert would testify on petitioner's behalf is insufficient to establish *Strickland* prejudice); *Grisby*, 130 F.3d at 373 ("Speculation about what an expert could have said is not enough to establish prejudice.").  Johnson is therefore not entitled to relief on any argument advanced in support of his ineffective assistance of counsel claim either.

Ground 4. Cumulative Error

Finally, Johnson alleges that cumulative error warrants the reversal of his conviction. "While the combined effect of multiple errors may violate due process even when no single error amounts to a constitutional violation or requires reversal, habeas relief is warranted only where the errors infect a trial with unfairness."  *Peyton v. Cullen*, 658 F.3d 890, 896-97 (9th Cir. 2011) (citing *Chambers v. Mississippi*, 401 U.S. 284, 298, 302-03 (1973)).  Such "infection" occurs where the combined effect of the errors had a "substantial and injurious effect or influence  in

44

determining the jury's verdict." *Brecht*, 507 U.S. at 623 (citation omitted).  In other words, where the combined effect of individually harmless errors renders a criminal defense "far less persuasive than it might [otherwise] have been," the resulting conviction violates due process. *See Chambers*, 401 U.S. at 294.  As discussed above, however, Johnson does not allege any claims that amount to error, and thus he demonstrates no errors that can accumulate to a level of a constitutional violation. *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002).  Johnson is therefore not entitled to relief on his cumulative error claim.

## V. CONCLUSION AND ORDER

Johnson is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* Fed. R. App. P. 22(b); 9th Cir. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: March 26, 2015.

      /s/James K. Singleton, Jr.      
      JAMES K. SINGLETON, JR.
      Senior United States District Judge

45